Isaac N. Sutphin
HOLLAND & HART LLP
2515 Warren Avenue, Suite 450
P.O. Box 1347
Cheyenne, WY  82003-1347
(307) 778-4263

Risa Lynn Wolf-Smith (admitted *pro hac vice*)
HOLLAND & HART LLP
555 17th Street, Suite 3200
Post Office Box 8749
Denver, CO  80201-8749
(303) 295-8011

ATTORNEYS FOR GEOSYNFUELS LLC

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: ) | |
| ) | Case No. 12-21085 |
| WESTERN BIOMASS ENERGY LLC,  ) | Chapter 11 |
| ) | |
| Debtor.  ) | |

# GEOSYNFUELS LLC'S OBJECTION TO DEBTOR'S MOTION FOR APPROVAL OF SALE OF PERSONAL PROPERTY AND MOTION TO APPROVE SETTLEMENT AGREEMENT

GeoSynFuels LLC ("GeoSyn"), by and through its attorneys Holland & Hart LLP, respectfully submits this Objection to Debtor's Motion for Approval of Sale of Personal Property (Dkt. 194) and Motion to Approve Settlement Agreement (Dkt. 198).  In opposition thereto, GeoSyn states as follows:

**I.    Introduction**

On June 12, 2013, GeoSyn participated in a court-approved on-line auction as part of Debtor's liquidation efforts.  GeoSyn participated in the auction in good-faith reliance upon this Court's Amended Order Authorizing and Approving Auction Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims and Interests.  Per that Order, the Court authorized Debtor's proposed auction and approved the sale of the assets to the high bidder.

Apparently unhappy with the outcome of the court-sanctioned auction, Debtor and Security National Bank of Omaha ("SNB") present a new Motion for Approval of Sale of Personal Property ("API Sale Motion") seeking to sell the very assets that GeoSyn purchased at auction to another company, American Process, Inc. ("API").  As the successful purchaser at auction, GeoSyn opposes the API Sale Motion.  Importantly, API was well aware of the court-approved auction and actually offered to purchase a portion of the Debtor's assets during the auction, but it was not the highest bidder.  This new and belated API offer ignores the already approved auction, the sale to GeoSyn, and the final order approving that sale.  Even if the GeoSyn sale were not final, Debtor has failed to provide essential information about the proposed API sale.  For example, Debtor has provided nothing to demonstrate that API has the financial ability to consummate the transaction nor even any earnest money or other acceptable form of commitment from API.

Rather than accept the results of an auction process that it once encouraged, Debtor would now have this Court set aside the sale to GeoSyn as if it never happened.  Debtor's ally in this attempt is SNB.  Just as Debtor embraced the auction process, SNB was happy to see

Debtor's assets liquidated according the court-approved auction procedures. Interestingly, SNB did not offer or agree to provide any form of DIP financing with a carveout for administrative expenses to permit a more extended liquidation and marketing period. Instead, it allowed the case to proceed with the likely outcome that administrative claims for professionals and other administrative expenses would remain unpaid. Only now has it offered a carveout to pay administrative expenses plus some unknown return—not specified anywhere—for unsecured creditors. The proposed carveout and "settlement" is not only a transparent attempt to buy the support of estate professionals, but also an impermissible *sub rosa* plan which provides for distributions to certain classes of creditors but which bypasses the protections and requirements for confirmation of a plan of reorganization.

GeoSyn is entitled to possession of the assets it purchased from Debtor at the court-approved auction. The auction was conducted fairly after thorough marketing to parties in interest as provided by the Sale Order. Finality and fairness demand that this Court reject Debtor's attempts to ignore the auction results and undo its own final order, and Debtor's API Sale Motion and related Motion to Approve Settlement Agreement should be denied.

**II.     Relevant Facts and Procedural History**

On February 21, 2013, Debtor filed its Application to Employ Great American Group, LLC as Financial Consultant and Liquidator (Dkt. 99). In its Application, Debtor stated that it was in "the best interests of its estate and all creditors to liquidate a substantial portion of its assets." *Id.* at ¶ 3. The Debtor identified Great American Group, LLC ("Great American") as an

entity qualified to market and liquidate Debtor's assets.  This Court approved the Application to Employ by Order dated February 26, 2013 (Dkt. 107).

On April 5, 2013, Debtor filed a Motion for Approval of Auction Sale of Personal Property (Dkt. 136).  The Motion for Approval of Auction Sale ("Auction Sale Motion") requested approval of an expedited sale process in order to alleviate Debtor's mounting financial concerns.  Debtor stated it had suffered "cash flow constraints" and was "no longer in a financial position to satisfy its ongoing operational expenses." *Id.* at ¶ 6.  The Sale Motion set forth a very detailed process that Great American would follow to market and sell Debtor's primary asset, an ethanol plant in Upton, Wyoming ("Plant Assets").  It provided a time period for marketing the assets and seeking Going Concern Buyers and Piecemeal Buyers.  If those efforts did not result in successful liquidation of the Plant Assets, Great American agreed to conduct an on-line auction.

The Auction Sale Motion was duly noticed on creditors, including SNB.  No objections were filed.  SNB did not object to the Auction Sale Motion, and specifically, did not object to the Motion on the grounds that its right to credit bid and participate in the auction pursuant to 11 U.S.C. § 363(k) be preserved.  Nor did SNB propose or agree to any form of DIP financing to allow for longer and more extensive liquidation or marketing efforts.  Rather, SNB acquiesced and supported Debtor's fast-track process.

This Court granted the Auction Sale Motion by entering its Amended Order Authorizing and Approving Auction Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims and Interests (Dkt. 148) on May 2, 2013 ("Sale Order").  The Sale Order not only

4

authorized the sale by auction, but also approved the sale to the successful bidder.  The only outstanding item following the auction sale was to be the filing of a final report pursuant to F.R.B.P. 6004(f).  Nothing in the Sale Order required any further Court action or approval.  Rather, the plain language of the Auction Sale Motion shows that Debtor was seeking pre-approval of the sale in order to expedite the liquidation of the Plant Assets.  Likewise, the plain language of the Sale Order confirms that the sale itself was approved and that the high bidder for each lot would be entitled to possession of the assets upon payment.

Great American thoroughly marketed the Plant Assets in accordance with the Auction Sale Motion and the Sale Order.  Notwithstanding the fast-track nature of the sale, Great American solicited bids from nearly 28,000 potential buyers in the synthetic fuels industry.  *See* Great American Group, LLC's Response to Objection to Sale (Dkt. 207 at ¶3).  In addition to numerous printed advertisements, the Plant Assets were also the subject of over 180,000 additional solicitation emails.  Specifically, Great American marketed the Plant Assets to API.  It is undisputed that API received email notice of the auction sale no later than May 16, 2013.  More significantly, attached hereto as *Exhibit A* is an email from Steve Rutherford of API to Paul Brown of Great American which shows that on June 12, 2013 – the day of the auction – ***API offered to purchase a majority of Debtor's assets for $210,000***.

Despite its marketing efforts, Great American did not receive any Going Concern bids or Piecemeal bids prior to the on-line auction, and the auction was set for June 11-12, 2013. Prior to the auction, GeoSyn relayed its formal Expression of Interest in the form of a letter, a copy of which is attached as *Exhibit A* to GeoSyn's Response (Dkt. 176).  In that letter, dated June 7,

5

2013, GeoSyn indicated that it wished to acquire all of the Plant Assets, but that it was in the midst of a company financing and would not be able to make a committed offer. GeoSyn further requested that the auction be postponed for four weeks to allow it to complete its financing. The request was expressly rejected by both Debtor and SNB.

As a result, GeoSyn chose to participate in the auction by submitting an aggregate bid divided among each of the individual lots. It did so without guaranty or assurance that it would be the high bidder. GeoSyn was the high bidder on each lot, with a total purchase price of $525,000. "Great American conducted the auction in full compliance with the Auction Order and consistent with industry standards. The results of the auction represent the highest and best bid made for the subject assets at the time of the auction." Great American Group, LLC's Response to Objection to Sale (Dkt. 207) at ¶ 5.

GeoSyn submitted payment for the auction to Great American. Pursuant to the Sale Order, the only remaining step to finalize the sale was the filing of a Final Report of Sale, which Debtor filed on June 25, 2013 (Dkt. 175).

Despite the inherent finality in the Court's Sale Order and GeoSyn's successful purchase of the Plant Assets, Debtor now seeks the Court's approval of another sale of the same assets. Debtor's Motion comes on the heels of SNB's misplaced efforts to set aside the sale to GeoSyn. *See* Motion to Stay Transfer of Assets Pending Resolution of Security National Bank of Omaha's Objection (Dkt. 167) and Objection to Sale and Motion for Entry of an Order Denying Conformation of the Sale of Substantially All of Debtor's Assets Free and Clear of Liens, Claims and Interests and Setting Aside Sale (Dkt. 165). GeoSyn has already responded to SNB's

6

Motion, and hereby incorporates its arguments as if set forth fully herein. *See* Response to Objection to Sale and Motion for Entry of an Order Denying Confirmation of the Sale of Substantially all of Debtor's Assets Free and Clear of Liens, Claims and Interests and Setting Aside Sale (Dkt. 176) and Supplemental Response to Objection to Sale and Motion for Entry of an Order Denying Confirmation of the Sale of Substantially all of Debtor's Assets Free and Clear of Liens, Claims and Interests and Setting Aside Sale (Dkt. 219).

According to Debtor's API Sale Motion, API has proposed to purchase the Plant Assets for $1,218,750.00. In support of its Motion, Debtor has submitted an Offer to Purchase from API dated June 25, 2013. Except for the Offer to Purchase, Debtor has provided no further details about API nor even provided any form of asset purchase agreement. Moreover, the Debtor has provided no information about the financial wherewithal of API or its ability to close on its offer. It appears that API has not even posted an earnest money deposit or produced proof of financial commitments to support its effort to unwind the sale to GeoSyn after the fact. API was well aware of Debtor's intention to sell its assets at auction and made a prior offer to purchase on the day of the auction.

### III. Argument

### A. **API was aware of the court-approved auction and made a bid on the day of the auction; it should not be permitted to lay in wait with a new post-auction bid.**

Although very little information about API has been disclosed, we know that API was well aware of Debtor's intention to liquidate its assets. It received notice of the auction no later than May 16, 2013, and on June 12, 2013, API actually made an offer to purchase certain assets

7

for $210,000 as delineated in the email and attachment from Steve Rutherford to Paul Brown. *See Exhibit A attached hereto*. However, API's bid was not the highest or best bid, and it was not accepted.

API then waited until June 25, 2013 – 13 days after the close of the auction – to rethink its bidding strategy and make a new uncommitted aggregate bid for the Debtor's previously sold assets. This post-auction offer was made without any request for an injunction or explanation why it should be considered. Such a post-auction rebid may not be entertained by Debtor or the Court under the auction procedures as previously approved, or under applicable law.

    **B.**    **As a matter of law, the Court should not entertain a new bid after entry of its final sale order.**

Pleadings filed by Debtor and SNB in this matter mischaracterize the case law which must guide this Court. It is well-established that once an order approving a sale is entered, a bankruptcy court may not vacate its prior order except in extraordinary circumstances such as fraud, mistake or like infirmity, and the court's range of discretion is narrow. *Smith v. Juhan,* 311 F.2d 670 (10th Cir. 1962); *In re Chung King,* 753 F.2d 547 (7th Cir. 1985); *In re Kreger,* 307 B.R. 106 (8th Cir. B.A.P. 2004). As the Tenth Circuit Court of Appeals explained:

> The rule is settled, and it seems to be universally approved, that after confirmation of a judicial sale neither inadequacy of price, nor offers of better prices, nor anything but fraud, accident, mistake, or some other cause for which equity would avoid a like sale between private parties, will warrant a court in avoiding the confirmation of the sale or in opening the latter and receiving subsequent bids….Where one's bid has been accepted, he has a vested interest which under the decisions may be destroyed only for the most cogent of reasons, such as fraud, or conduct which in effect amounts to fraud. But as has been said many times, the

>mere fact that someone comes forward and offers to bid more will not be tolerated because it is an invasion of a right acquired by the successful bidder at a free and open sale and for the further and even more weighty reason that permitting this to be done would undermine confidence in judicial sales and thus defeat the end sought to be obtained, the protection of estates being thus liquidated.

*Smith v. Juhan, supra,* 311 F.2d at 672-673. *See also In re Webcor,* 392 F.2d 893, 899 (7th Cir. 1968)("[i]f parties are to be encouraged to bid at judicial sales there must be stability in such sales and a time must come when a fair bid is accepted and the proceedings are ended."); *In re Food Barn Stores, Inc.,* 107 F.3d 558 (8th Cir. 1997)("Finality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, for devotion to those principles encourages fervent bidding and ensures that interested parties will sincerely extend their best and highest offers at the auction itself.").

This policy of finality protects confirmed sales in bankruptcy unless "compelling equities" outweigh the interests in finality. *In re Chung King, supra,* 753 F.2d at 550. *In re Transcontinental Energy,* 683 F.2d 326, 328 (9th Cir. 1982)*; Matter of Cada Investments, Inc.,* 664 F.2d 1158, 1162 (9th Cir. 1981). Further, "after confirmation, the offer of a substantially higher sale price alone is insufficient to set aside a confirmed sale." *In re Chung King, supra,* 753 F.2d at 550. *Cf. In re Kreger, supra, 307 B.R.* at 111 ("once the order approving the sale is entered, that order represents a binding obligation").

In this case, at Debtor's request and with SNB's support and acquiescence, the Court's Sale Order was self-effectuating by its own terms. It provided in advance for pre-approval of a sale to the highest bidder (or bidders) at the court-approved auction. The procedure

9

contemplated no further approval or confirmation by the Court. Contrary to the characterization of the Sale Order by SNB, there was no two-step process here in which the Court first approved auction procedures and then Debtor was required to submit the highest bid to the Court for approval. To the contrary, the plain language of the Sale Order specifically authorized Debtor to sell the assets and found that the sale would be a free and clear sale because one or more of the subsections of Section 363(f) had been satisfied:

> The Debtor may sell the Assets, and all interests it has therein, free and clear of all claims and interest of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

*Sale Order at ¶ b*. In addition, the Court ordered: "The Assets shall be sold free and clear of all claims and interest of any kind or nature whatsoever" and added a notation that "valid liens shall attach to the proceeds." *Id at ¶ 2*. Sales proceeds were to be segregated in a separate Debtor-in-Possession account, and the Debtor was to file a final report pursuant to F.R.B.P. 6004. *Id at ¶¶ 1.a., 1.b., and 3*. Last, Debtor was authorized to pay any creditor with a valid and perfected lien to the extent the claim was not in dispute. *Id at ¶4*. In this way, it is clear that the Sale Order was an order confirming the sale and may not be unwound absent a showing of extreme circumstances which shock the conscience of the Court.

The facts here are that GeoSyn followed and relied in good faith on the auction procedures as approved by the Court in what is uncontrovertibly a final sale order. Its expectation that as the highest bidder at auction, it be permitted to purchase Debtor's assets should not be thwarted. *In re Wintex, Inc.,* 158 B.R. 540, 545 (D.Mass. 1992) ("[T]he hallmark

10

of *Gil-Bern* is…fealty to bidders' expectations."). Certainly, GeoSyn should not be made to suffer the very real damages of an involuntary freeze on its business and funding activities while it waits for the Sale Order to be enforced.

These facts are a world apart from the facts of the cases relied upon by the Debtor and SNB in which the bankruptcy courts had yet to confirm the sales in question. Thus, in *In re Am. Freight Sys., Inc.,* 194 B.R. 261 (D.Kan. 1990), the district court affirmed the bankruptcy court's consideration of additional bids where the initial bid had not yet been approved by the court. Similarly, despite Debtor's wholly inaccurate description of the case as "a similar situation as presented by this matter," [1] in *Food Barn Stores, Inc., v. Four B. Corporation,* 107 F.3d 558 (8th Cir. 1997), no order had been entered approving a sale, and the purchase contract was by its own terms subject to and required bankruptcy court approval to be effective. More specifically, in that case, the appellate court upheld the bankruptcy court's decision to consider another bid during the course of the confirmation hearing even though the bankruptcy judge had orally declared his "preliminary inclination" to approve the original purchase offer before taking a recess. Indeed, all of the cases cited by SNB regarding inadequate price (*see page 8 of SNB's Reply to GeoSyn Fuel's Response, Dkt 246)* involved timely objections made prior to the entry of sales orders. *See In re Muscongus Bay Co.,* 597 F.2d 11 (1st Cir. 1979) (upholding bankruptcy court's refusal to confirm bid at sale confirmation hearing); *In re Snyder,* 74 B.R. 872, 873 (Bankr. E.D. Pa 1987) (sale agreement was subject to the court's approval and sale had yet to be

---

[1] *See Debtor's Response in Support of Security National Bank of Omaha's Objection to Sale,* Dkt. 202, at page 4.

11

approved); *In re Kendall Foods Corp.,* 122 B.R. 792 (Bank. S.D. Fla. 1990) (concerning a motion to confirm and reject bids).

Again, only in extreme and limited circumstances may a court set aside a sale confirmation order. *See, e.g., In re BCD Corp.,* 119 F.3d 852 (10th Cir. 1997) (sale vacated based on mistake where purchaser changed the terms of the sale by demanding reimbursement for environmental clean-up costs); *Mason v. Ashback,* 383 F.2d 779 (10th Cir. 1967) (transfer illusory where no notice of sale to creditors); *In re Fitzgerald,* 428 B.R. 872 (9th Cir. B.A.P. 2012) (sale order reversed in extreme situation where the only party bidding was the defendant in the debtor's state court litigation); *In re Donohue,* 410 B.R. 311 (Bank. D. Kan. 2009) (agreed order reflecting proposed sale to secured lender set aside where no notice to parties in interest). No showing of such extreme circumstances has been made here.

### C. By definition, the auction itself demonstrates that the sale to GeoSyn reflects a market price which cannot be "grossly inadequate."

The Debtor and SNB argue that the sale to GeoSyn must be set aside on the grounds that the sales price is "grossly inadequate." However, the evidence will show that the Debtor's assets were thoroughly marketed and that a fair and open auction was conducted by an expert and experienced auctioneer with participation by at least 37 bidders. GeoSyn's aggregate offer for the plant assets was the highest bid. Under these circumstances, the auction results prove that the GeoSyn purchase price was fair market value.

Indeed, a well-established line of cases holds that it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted

auction sale. *See In re Gil-Bern Indus.,* 526 F.2d 627, 629 (1st Cir. 1975) and the cases following it.[2] Commenting on the importance of this principle, the Second Circuit noted:

> …G*il-Bern* properly reasoned that accepting the post-auction higher bid would be a "penny wise and pound foolish" practice, because it would encourage parties to submit low formal bids and then come back, if necessary, with higher post-auction offers….Or, perhaps worse, to permit the acceptance of post-auction bids might well entirely discourage bidding at bankruptcy sales.

*In re Financial News Network, Inc.,* 980 F.2d 165. 169-170 (2d Cir. 1992). Further, many courts have observed that "the fullest possible measure of fairness and finality is by way of a public auction." *In re Psychometric Sys.,* 367 B.R. 670, 675 (Bankr. D. Colo. 2007); *In re Landscape Properties, Inc.,* 100 B.R. 445 (Bankr. E.D. Ark. 1988); *Matter of Ohio Corrugating Co.,* 59 B.R. 11 (Bankr. N.D. Ohio 1985).

In this way, the auction itself is the best evidence that GeoSyn's purchase price cannot be considered "grossly inadequate."

### D. Debtor has not provided proof of API's commitment or financial wherewithal.

Compounding concerns over the untimeliness of API's offer is the complete lack of any information to substantiate API's ability to close. Debtor has only submitted a single document in support of its API Sale Motion, a scant two-page Offer to Purchase dated June 25, 2013. Although the Offer to Purchase purports to convey a firm offer to purchase the Plant Assets for $1,218,750.00, API has posted no deposit and stands to lose nothing if it fails to consummate the

---

[2] *In re Gil-Bern Indus.,* 526 F.2d 627, 629 (1st Cir. 1975) and its progeny was superseded by *Hayes v. Sullivan,* 1992 U.S. Dist. LEXIS 21443 (D. Mass. Dec. 3, 1992) when the Bankruptcy Code was amended in 1978, but both cases stand for the same proposition.

sale. Moreover, Debtor has not submitted any evidence to verify that API is financially able to complete the sale. Common sense and industry practices demand that at least some diligence be performed before committing to unwind the results of the court-approved auction and sale.

      E.    **The Proposed Sale and Settlement Agreement Amount to An Impermissible *Sub Rosa* Plan.**

In its desperation to unwind the auction and final sale to GeoSyn, SNB has essentially purchased the support of the key parties--namely, the estate's professionals--by agreeing to a $368,750.00 carveout from the proposed purchase price to "satisfy administrative expenses and provide a meaningful distribution to unsecured creditors of the estate." *Sale Motion (Dkt. 194) at ¶ 5.* However, no disclosure or information is provided regarding the amount of money to be paid to unsecured creditors or the allocation between administrative and unsecured claims, and creditors are left to guess at their likely return. More objectionable, the proposed distribution and allocation between just these two creditor classes completely ignores the claims of other competing creditors, such as secured creditors and priority claimants. For example, Debtor's Schedule D reveals a list of seven secured creditors besides SNB with claims ranging from $156,589.18 to $7,500, yet the claims of these senior creditors are completely ignored. *See Debtor's Amended Schedule D (Dkt No. 43) filed January 11, 2013.* Similarly, the Debtor's Schedule E contains a list of numerous priority claims, but it is unclear how these claims will be treated under the proposed settlement. *Id.*

Again, it is apparent that SNB now believes it should have financed the administrative costs of a more prolonged marketing process by agreeing to a DIP funding carveout in the first

place. Instead, it supported and condoned an expedited process, leaving the estate with no assurance that there would be sufficient funds to pay professionals or other administrative expenses.

More to the point, the proposed settlement and carveout amount to an impermissible *sub rosa* plan which not only violates the distribution scheme mandated by the Bankruptcy Code, but which is proposed without any real disclosure to creditors about what they might receive. *In re Braniff Airways Inc.,* 700 F2d 935 (5th Cir. 1983)(courts should reject a sale under Section 363 that is tantamount to an improper *"sub rosa"* liquidating plan without granting creditors the critical procedural safeguards and protections of Section 1129 of the Bankruptcy Code); *In re White Motor Credit Corp.,* 14 B.R. 584 (Bank. N.D. Ohio 1981) (asset sale under 363(b) conflicts with reorganization provisions of chapter 11). Thus, where the financial provisions of a contemplated sales transaction are such that they have the "practical effect of dictating some of the terms of any future reorganization plan," a proposed Section 363 sale should be rejected. *In re Braniff Airways, supra,* 700 F2d at 940. The Court must therefore reject the proposed settlement as an improper effort to sidestep the confirmation and disclosure requirements of Chapter 11, including 11 U.S.C. § 1125 (disclosure), 11 U.S.C. § 1126 (voting), 11 U.S.C. § 1129(b)(2)(B) (absolute priority rule).

## IV.    Conclusion

API was well aware of the auction on June 12, 2012 and made an offer to purchase a portion of Debtor's assets, but its offer was not the highest or best offer. Given these facts, under applicable case law and this Court's Sale Order, API should not be permitted to make a new

post-auction bid. To allow API or any other party to rebid absent a showing of fraud, mistake, accident or some other circumstance which shocks the conscience of the Court would undermine confidence in bankruptcy auctions and the reasonable expectations of potential bidders. For this reason, the law is clear, rigid, and uniform that final sales orders may not be vacated except in extraordinary circumstances—not shown here. Debtor's assets were thoroughly and aggressively marketed by Great American, and the auction results demonstrate that the GeoSyn's purchase price cannot be "grossly inadequate."

Moreover, the proposed settlement agreement with SNB is not only a blatant attempt to purchase the support of the estate's professionals and the Committee, but also amounts to a *sub rosa* plan which sidesteps the confirmation and disclosure requirements of Chapter 11. In particular, no disclosure regarding the likely return to creditors of various classes has been made, and creditors must speculate how the SNB "carveout" will be distributed. If SNB wished to provide a "meaningful distribution" to creditors, it should have agreed to do so before the Sale Order was entered. By failing to fund Debtor's liquidation efforts and not insisting on a right to credit bid, SNB sat on its rights and acquiesced to the sale process approved by the Court. It cannot now complain.

FOR THESE REASONS, GeoSyn respectfully requests that Debtor's API Sale Motion and related Motion to Approve Settlement Agreement be denied. GeoSyn further seeks compensation for legal costs and damages suffered in this matter, and for such further relief as the Court deems necessary and proper.

Dated: July 26, 2013.

                          Respectfully submitted,

                          /s/ Isaac N. Sutphin
                          Isaac N. Sutphin
                          Wyoming State Bar #6-3711
                          HOLLAND & HART LLP
                          2515 Warren Avenue, Suite 450
                          P.O. Box 1347
                          Cheyenne, WY 82003-1347

                          Risa Lynn Wolf-Smith (admitted *pro hac vice*)
                          Colorado State Bar #15835
                          HOLLAND & HART LLP
                          555 17th Street, Suite 3200
                          Post Office Box 8749
                          Denver, CO 80201-8749

                          ATTORNEYS FOR GEOSYNFUELS LLC

### CERTIFICATE OF SERVICE

I, Isaac N. Sutphin, hereby certify that on July 26, 2013, a true and correct copy of the foregoing *GeoSynFuels LLC's Objection to Debtor's Motion for Approval of Sale of Personal Property and Motion to Approve Settlement Agreement* was served upon the Office of the United States Trustee and all Parties registered on the CMECF Electronic Mailing System.

/s/ Isaac N. Sutphin

6300546_3.DOCX