FILED

3:22 pm, 12/20/13

Tim J. Ellis
Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re ) | |
| ) | |
| WESTERN BIOMASS ENERGY ) | Case No. 12-21085 |
| LLC, ) | Chapter 11 |
| ) | |
| Debtor. ) | |

## OPINION ON TRUSTEE'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT

On November 26, 2013, the court held an evidentiary hearing on the *Motion to Approve and Enforce Settlement Agreement* ("Settlement Agreement") filed by Randy Royal, chapter 7 trustee ("Trustee"). Security National Bank of Omaha ("Bank") filed its objection. At the request of the parties, the court concurrently held the hearing on the Bank's *Motion for Relief from Stay* ("Relief Motion") and the Trustee's objections. At the conclusion of the hearing, the court took both matters under advisement. After reviewing the record, testimony and other evidence, applicable law, and the parties arguments, the court is prepared to rule.

**Jurisdiction**

This court has jurisdiction of this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under § 157(b)(2)(G).

**Facts**

The history of this case is extremely involved with numerous complicated and overlapping issues.

On October 31, 2012, Western Biomass Energy, LLC ("Debtor") filed its chapter 11 bankruptcy petition. As the debtor-in-possession, Debtor continued to manage the business which consisted of a demonstration ethanol plant and other assets located in Upton, Wyoming. However, Debtor was not producing ethanol for sale and was forced into bankruptcy due to the expiration of existing contracts. Through the testimony presented at numerous hearings, the court learned that this facility is a state-of-the-art ethanol plant constructed with the best components and technology. In December 2012 and January 2013, Debtor sold equipment and ethanol using part of the proceeds to maintain the property and pay the day-to-day expenses with the Bank's consent to the use of its cash collateral and the court's approval.

Debtor filed its *Motion for Authority to Obtain Credit Under Section 364(b)* on December 7, 2012. The Bank and the Official Unsecured Creditors' Committee ("OUCC") filed objections opposing the super-priority creditor status that was proposed for the debtor-in-possession lender. After an evidentiary hearing, the court denied this motion on February 26, 2013. Prior to resolution of this motion, the OUCC filed a motion to convert the case to a chapter 7. OUCC's motion to convert was subsequently resolved by a stipulation that provided for the appointment of a chapter 11 trustee, at the conclusion of the sale of the Debtor's assets through the on-line auction.

On February 21, 2013, Debtor filed its motion to employ Great American Group, LLC ("Great American") as the financial consultant and liquidator for the bankruptcy estate. The court granted the motion. Thereafter, Debtor filed its motion for the court's

Page 2

approval to liquidate substantially all of the Debtor's assets. The motion was granted and Great American held the on-line auction on June 11 and 12, 2013. GeoSynFuels, LLC ("GeoSyn") was the successful bidder and purchased Debtor's assets for the amount of $525,000.00.

On June 20, 2013, the Bank filed its *Objection to Sale and Motion for Entry of an Order Denying Confirmation of the Sale of Substantially All of Debtor's Assets Free and Clear of Liens, Claims and Interests and Setting Aside Sale* ("Bank's Objection"). GeoSyn filed its response. Debtor then filed a *Motion to Sell Property Free and Clear of Liens* on July 3, 2013 ("API Sale Motion"). This was a proposed sale to a different party, American Process, Inc. ("API") than the purchaser from the on-line auction sale, e.g., GeoSyn. The Debtor also filed its *Motion to Approve Settlement Agreement*. This is the agreement that the Trustee is currently seeking the court's approval and enforcement.

On July 30, 2013, the court held hearings on all three pending matters: (1) Bank's Objection; (2) API Sale Motion; and, (3) Debtor's Settlement Agreement. At the conclusion of these hearings, the court took the matters under advisement.

On August 1, 2013, based upon the United States Trustee's unopposed *Motion to Convert*, the court converted the chapter 11 case to a chapter 7. Randy Royal was appointed as the chapter 7 trustee.

Thereafter, on August 6, 2013, the court entered: (1) the opinion and judgment

sustaining the Bank's Objection and denying confirmation of the GeoSyn sale; (2) the order denying the API Sale Motion without prejudice; and, (3) the order denying approval of the Settlement Agreement without prejudice. On August 15, 2013, GeoSyn filed its notice on intent to appeal the court's opinion and judgment regarding the Bank's Objection to the Tenth Circuit Bankruptcy Appellate Panel. GeoSyn filed a Motion for a Stay or Other Relief Pending Appeal, which is currently under advisement with this court. The Bank filed its motion requesting relief from the automatic stay, which, as stated, is currently under advisement. The Trustee filed this Motion to Approve and Enforce Settlement Agreement Compromise under Rule 9091 on October 17, 2013.

**Discussion**

Fed. R. Bankr. P 9019 provides that, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The Trustee argues that the Settlement Agreement, which this court previously denied without prejudice, should be approved and enforced as it is in the best interest of the estate and the only ability that the estate has to pay administrative claims and provide a "meaningful" distribution to unsecured creditors. The Trustee asserts that the court denied confirmation of the sale to GeoSyn as the sale provided for only a partial payment to the Bank and no distribution to unsecured creditors. If the court does not approve and enforce the Settlement Agreement, a "sale by the Trustee will provide payment to the Bank and nothing to the unsecured creditors." Secondly, the Trustee argues that the

Settlement Agreement's reference to API as the purchaser is not binding as the Bank acknowledged the Agreement would be binding if another entity other than API was the purchaser. Next, the Trustee asserts that the Bank capped its secured claim at $850,000.00 and any deficiency claim at $25,000.00. Lastly, the Trustee argues that the Bank is judicially estopped from arguing against approval and enforcement of the Agreement.

Bank objects to the approval and enforcement of the Settlement Agreement, arguing (1) the plain, clear and unambiguous language indicates that the terms of the agreement were contingent on the Court's approval of the sale of the assets to API as a condition precedent; (2) the Trustee has not proposed a sale or any other potential buyer; and, (3) the court should deny the motion to enforce the Settlement Agreement based upon equity and the Bank's pending motion for relief from the stay as the Bank is suffering, and will continue to be harmed, as it is forced to pay over $10,000.00 per month to protect the collateral by paying for security, utilities and insurance on the assets. The Trustee does not have funds in the chapter 7 case to pay these on-going expenses.

The Bankruptcy Court looks to applicable state law to construe and interpret contracts.[1] Therefore, the court will apply Wyoming law to the interpretation of the Settlement Agreement.

The Wyoming Supreme Court states,

---

[1] *In re Schott*, 282 BR. 1,7 (10th Cir. BAP 2002), citing *Butner v. United States*, 440 U.S. 48, 54 (1979).

Page 5

"A court must consider all of the pertinent language in an agreement in interpreting the agreement. Wyoming's rules of interpretation require that the court interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning. The court presumes each provision in the contract has a purpose, and the court avoids interpreting the contract so as to find inconsistent provisions or so as to render any provision meaningless. [2] When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties.[3] If the language is ambiguous, then a court may use extrinsic evidence in an effort to determine the intentions of the parties.[4]

The Settlement Agreement was entered into between the Debtor and the Bank, collectively known as "Parties." The Settlement Agreement provided that the Debtor would file: (1) a motion to approve the Settlement Agreement; (2) a response supporting Bank's Objection; and, (3) the API Sale Motion.

Specifically, the Settlement Agreement states the following relevant terms:

2.  "If the Sale of the Assets to GeoSyn is set aside and the sale of the Assets to API is approved:
    a. Bank shall only be entitled to the first $850,000.00 of the Purchase Price, to be paid to Bank immediately upon closing of the sale to API; and,
    b. The remainder of the Purchase Price shall be used to satisfy: (1) allowed administrative claims (including United States Trustee fees); (2) any allowed claim of Great American Group, LLC; and, (3) a distribution to unsecured creditors of WBE's bankruptcy estate after the above two expenses categories have been

---

[2] *Sheridan Fire Fighters Local No. 276, IAFF, AFL-CIO, CLC v. City of Sheridan, Wyo.*, 303 P.3d 1110, 1116 (Wyo, 2013).

[3] *Union Pacific Resources Co. v. Texaco*, 882 P.2d 212, 220 (Wyo. 1994).

[4] *Sheridan Fire Fighters* at *1114* citing *Davison v. Wyoming Game and Fish Comm'n*, 238 P.3d 556, 560 (Wyo. 2010)

Page 6

fully satisfied.

3. To the extent Bank has an allowed deficiency claim, Bank shall be entitled to share with other unsecured creditors of WBE's bankruptcy estate in any distribution to unsecured creditors, but in no event shall Bank's recovery on an allowed deficiency claims exceed $25,000.00.

4. To the extent that the Assets are sold to GeoSyn, API or another entity (in the event an offer is received by WBE from another entity and that offer exceeds the Purchase Price), and the purchase price of said sale exceeds $1,218,7500.00, Bank shall be entitled to recover all amounts in excess of $1,218,750.00 until its allowed claim is paid in full.

5. This Agreement is subject to the Bankruptcy Court's approval."

The court denied approval of the Settlement Agreement, without prejudice.

Interpreting the Settlement Agreement

The court must consider all the pertinent language in interpreting the Settlement Agreement, as a whole, reading each provision in light of all the others to find their plain meaning. The court interprets the Settlement Agreement to state that the Bank agreed to accept $850,000.00 as partial satisfaction of its secured amount, if two conditions were met: (1) the court set aside or not confirm the sale of the assets to GeoSyn from the on-line auction; and, (2) the court approve the sale of the assets to API in the amount of $1,218,750.00 or to another entity, GeoSyn and API included, for an amount greater than $1,218,750.00. The court denied confirmation of the sale to GeoSyn and did not approve the sale to API. Therefore, neither condition of the Settlement Agreement was met.

"An ambiguous contract is an agreement which is obscure in its meaning because

of the indefiniteness of expressed term..."[5] The Wyoming Supreme Court held, "where a contract is 'silent' on some significant point, 'the terms of the contract are obviously unclear.'"[6] The terms of the Settlement Agreement that are unclear and in dispute are: (1) the duration of time that a sale to another entity would be considered for an amount over $1,281,750.00; and, (2) whether the Bank's deficiency claim is capped at $25,000.00 not providing the Bank to collect reimbursement on the continuing protective payments. Therefore, the court finds that the Settlement Agreement is ambiguous and looks beyond its "four-corners" to determine the parties' intent.

Keith McCormick ("McCormick"), Senior Vice President of the Bank, testified that the Bank became aware of the API offer after the on-line auction was completed, from Debtor's counsel. To garner support for its objection to the confirmation of the GeoSyn sale from the Debtor and OUCC, the Bank agreed to provide a "carve-out amount" from the proceeds of any sale to API, to allow the estate to pay administrative claims. The Bank agreed to accept less than the total amount of its claim, in return for an expedited closing with API, which McCormick understood would be 10-15 days from the date the court approved the sale. The expedited closing date was important to the Bank as its claim continues to accrue interest and the Bank continues to pay the protective costs on the bankruptcy estate assets that is the collateral for the Bank's loan to the Debtor.

---

[5] *Sheridan Firefighers* citing *State Farm Fire and Casualty Co. v. Paulson*, 756 P.2d 764, 766 (Wyo. 1988) quoting *Bulis v. Wells*, 565 P.2d 487, 490 (Wyo. 1977).

[6] *Madison v. Marlatt*, 619 P.2d 708, 716 (Wyo. 1980).

Page 8

Brad Hunsicker ("Hunsicker"), Debtor's former counsel, and the party that drafted the Settlement Agreement, testified that approval of the API Sale Motion was necessary for the enforcement of the Settlement Agreement. He also testified that the parties' anticipated sale to API would bolster others' interest, including GeoSyn, to out bid API providing for a greater sale amount than previously attained at the on-line auction and the proposed sale to API.

The court, finding that the sale price for the estate's assets from the on-line auction to GeoSyn was grossly inadequate did not confirm the sale. At that hearing, Todd Harvey, of GeoSyn, testified that it was "willing to participate," in a bidding sale with API. Therefore, the court ordered the chapter 7 trustee to "evaluate and determine whether a telephone auction between interested parties is in the estate's best interest and proceed accordingly in the *immediate* future..."[7]

The court's review of the intrinsic testimony and evidence finds that the parties' intentions were for the sale to be consummated immediately with API, GeoSyn or an entity that might present a greater offer. Urgency was the concern. All parties appear to have wanted the sale of the assets to be resolved immediately, not allowing for an extended period for marketing and rescheduling of the sale.

The court's interpretation of the Settlement Agreement, testimony and other intrinsic evidence does not find that it was the parties' intent that the Bank would continue to pay the protective costs of security, insurance, and utilities on the estate's

---

[7] Order on Motion for Approval of Sale of Personal Property, entered on August 6, 2013. Emphasis added.

Page 9

assets indefinitely. The time period involved appears to be until the close of the API sale.

The court finds that the terms of the Settlement Agreement were not met. The sale to GeoSyn was not confirmed. The sale to API was not approved. The proposed sale to API did not generate a rush of potential buyers willing to get into a bidding war to purchase the assets for an amount greater than API's offer. The Settlement Agreement, by its own terms, is unenforceable. Therefore the court will not approve it.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

DATED this 20 day of December, 2013.

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
Dyekman
Smiley